AF Approval *KL for AMC*                    Chief Approval *MPF*

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 6:26-cr- *158 - GAP- NWH*

CHRISTOPHER ALEXANDER DELGADO

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, Christopher Alexander Delgado, and the attorneys for the defendant, Sean P. Shecter, Esq. and Maurice Johnson, Esq., agree as follows:

## A.    Particularized Terms

### 1.    Counts Pleading To

The defendant shall enter a plea of guilty to Counts One through Three of the Information. Count One charges the defendant with conspiracy to commit fraud, in violation of 18 U.S.C. § 1349, Count Two charges the defendant with wire fraud, in violation of 18 U.S.C. § 1343, and Count Three charges the defendant with money laundering, in violation of 18 U.S.C. § 1957.

### 2.    Maximum Penalties

Count One carries a maximum sentence of 20 years' imprisonment; a term of supervised release of not more than 3 years; a fine of not more than $250,000 or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater; and a special assessment of $100.

Defendant's Initials _(λ)_

Count Two carries a maximum sentence of 20 years' imprisonment; a term of supervised release of not more than 3 years; a fine of not more than $250,000 or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater; and a special assessment of $100.

Count Three carries a maximum sentence of 10 years' imprisonment; a term of supervised release of not more than 3 years; a fine of not more than $250,000 or twice the gross gain caused by the offense, or twice the gross loss caused by the offense, whichever is greater; and a special assessment of $100.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offenses, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offenses, or to the community, as set forth below.

3.    Elements of the Offenses

The defendant acknowledges understanding the nature and elements of the offenses with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

| | |
|---|---|
| First: | Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the information; and |
| Second: | the Defendant knew the unlawful purpose of the plan and willfully joined in it. |

Defendant's Initials _CS_                    2

The elements of Count Two are:

First:        The Defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations, or promises;

Second:    the false pretenses, representations, or promises were about a material fact;

Third:      the Defendant acted with the intent to defraud; and

Fourth:    the Defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

The elements of Count Three are:

First:        The Defendant knowingly engaged or attempted to engage in a monetary transaction;

Second:    the Defendant knew the transaction involved property or funds that were the proceeds of some criminal activity;

Third:      the property had a value of more than $10,000;

Fourth:    the property was in fact proceeds of wire fraud; and

Fifth:       the transaction took place in the United States.

4.    Indictment Waiver

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States

Defendant's Initials _CS_                          3

Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.     Mandatory Restitution to Victim of Offense of Conviction

Pursuant to 18 U.S.C. § 3663A(a) and (b), defendant agrees to make full restitution to all victims of these offenses. The defendant agrees that the overall loss to the victims was at least $250 million.

7.     Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will not oppose the defendant's request to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely

Defendant's Initials _____     4

with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

8.    <u>Cooperation - Substantial Assistance to be Considered</u>

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year

Defendant's Initials _CSD_                5

of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Use of Information - Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

10.    Cooperation - Responsibilities of Parties

a.    The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.    It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this

Defendant's Initials _____        6

agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case,

Defendant's Initials ⟨CÐ⟩                    7

pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)   The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)   The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)   The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

11.   <u>Forfeiture of Assets</u>

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant, or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, at

Defendant's Initials _Ç_     8

least $250 million in proceeds the defendant admits he obtained, as the result of the commission of the offenses to which the defendant is pleading guilty, as well as the following property, which were purchased or funded with proceeds of the wire fraud conspiracy and substantive wire fraud offense to which the defendant is pleading guilty:

## I. Real Property

1. The real property located at 5271 Isleworth Country Club Drive, Windermere, Florida 34786;[1]

2. The real property located at 141 S. Phelps Avenue, Winter Park, Florida 32789;

3. The real property located at 17416 Bal Harbour Drive, Winter Garden, Florida 34787;

4. The real property located at 222 Pawnee Trail, Kissimmee, Florida 34747;

5. The real property located at 189 S. Orange Avenue, Units 1800S, 1810S, 1820S, and 1870S, Orlando, Florida 32801, and all associated parking spaces;

6. The real property located at 7333 Bella Foresta Place, Sanford, Florida 32771;

7. The real property located at 746 Cavan Drive, Apopka, Florida 32703 (approximately $77,800.00 in proceeds was used to pay the mortgage on this property); and

8. The real property located at 2142 Country Side Drive, Apopka, Florida 32712 (approximately $89,949.53 in proceeds was used to pay the mortgage on this property).

---

[1] This property is also subject to forfeiture as property involved in the illegal monetary transaction charged in Count Three.

Defendant's Initials _CS_                    9

## II.  Vehicles

1.  2025 Lamborghini Revuelto, VIN: ZHWUC1ZM9SLA02300;

2.  2024 Rolls Royce Ghost, VIN: SCATD6C02RU222648;

3.  2024 Bentley Bentayga, VIN: SJAHT2ZV0RC025272;

4.  2024 Lamborghini Huracán EVO Spyder, VIN: ZHWUT4ZFXRLA26330;

5.  2025 Cadillac Escalade V, VIN: 1GYS9HR95SR147650;

6.  2024 Lincoln Navigator L, VIN: 5LMJJ3TG2REL19131;

7.  1951 Mercury, VIN: 51DA24185M;

8.  2017 Mercedes Benz C300, VIN: 55SWF4JBXHU230429;

9.  2023 Rolls Royce Cullinan, VIN: SLATV4C02PU217321;

10. 2022 Mercedes Benz Sprinter, VIN: W1X8EC3Y6NT121984; and

11. 2022 GMC Sierra HD, VIN: 1GT49PEY2NF310721.

## III.  Wire Transfers

1.  $166,861.35 from Goliath Ventures International Account 30000849574 wired to the Internal Revenue Service ("IRS") from Christopher Delgado on or about February 25, 2026;

2.  $596,532.00 wired to the IRS from Christopher Delgado's Emirates NBD High Interest Yield Account 1015880399401 on or about February 27, 2026;

3.  $585,099.00 from Emirates NBD High Interest Yield Account 1015880399401 deposited by Christopher Delgado into the Court Registry on or about June 2, 2026, plus any accrued interest;

4.  Net proceeds from the sale of the 2023 Ferrari 296 GTS, Vehicle Identification Number, VIN: ZFF01SMB000291713; and

Defendant's Initials CD          10

5.    Net proceeds from the sale of the 2023 Cadillac Escalade, VIN: 1GYS47KLXPR263920.

## IV.    Cryptocurrency

1.    2.116437636 Ethereum (ETH) in MetaMask Wallet Address 0xDec...9CA7;

2.    77,123,760 Medieval Empires (MEE) tokens in MetaMask Wallet Address 0xDec...9CA7; and

3.    8,709.08 USD (USDC) in MetaMask Wallet Address 0xDec...9CA7nt.

## V.    Return of Charitable Donations

1.    $255,000.00 Cashier's Check from Alliance Bank of Arizona, which represents a donation returned from Victoria's Voice Foundation;

2.    $10,000.00 Cashier's Check from PNC Bank, which represents a donation returned from Life and Liberty; and

3.    $25,000.00 Cashier's Check from PNC Bank, which represents donation returned from Conservative Solutions for Florida.

## VI.    Personal Property

All personal property purchased with fraud proceeds, including clothing, shoes, handbags, luggage, home furnishings and decor, jewelry, wine, spirits, and other luxury goods, including but not limited to:

### A.    *Domestic Personal Property*

*Watches*

1.    Rolex Oyster Perpetual Datejust, two-tone bracelet, silver dial;

2.    Rolex Oyster Perpetual Datejust, two-tone bracelet, white dial;

Defendant's Initials _C__    11

3. Rolex Sky-Dweller Oyster Perpetual, rubber bracelet, gold casing and bezel, black dial;

4. Rolex Oyster Perpetual Superlative Chronometer Cosmograph Daytona, seafoam green dial;

5. Rolex Oyster Perpetual Day-Date, gold, dark green dial;

6. Rolex Oyster Perpetual Day-Date, gold and diamond bracelet, gold bezel, turquoise dial;

7. Rolex Oyster Perpetual Day-Date, gold bracelet, diamond bezel, caramel dial;

8. Rolex Oyster Perpetual Day-Date, gold, dark brown dial;

9. Audemats Piguet watch, black leather strap, black dial with exposed gears;

10. Louis Vuitton watch case containing a Louis Vuitton watch, black leather strap, gold case, pewter dial, numbered 1 of 100;

11. Louis Vuitton watch case containing a Louis Vuitton watch, brown leather strap, clear dial with brown glitter, Louis Vuitton spin time anniversary edition 1of 50; and

12. Louis Vuitton watch case containing a Louis Vuitton desk clock/watch.

*Necklace and Bracelets*

1. Tiffany & Co. turquoise Pokémon box containing a silver Pikachu necklace;

2. Tiffany & Co. turquoise box containing gold bracelet with diamonds, inscribed: Au750Italyd 4.37ct; and

3. Audemars Piguet green box containing a gold and diamond bracelet.

*Luggage, Purses, Cases, and Wallets*

1. Louis Vuitton watch briefcase;

Defendant's Initials _CS_    12

2. Hermes Birkin B25 Rose Sakura with palladium hardware;

3. Hermes Mini Kelly Black Epsom with gold hardware;

4. Hermes Mini Kelly Rose Poupre Ostrich with palladium hardware;

5. Hermes B20 Mini Birkin Vert D'eau Matte Alligator with gold hardware;

6. Hermes Birkin B25 Black Matte Noir Alligator with gold hardware;

7. Hermes Black Kelly 25 Depeches Pouch Men's;

8. Hermes Birkin B25 Green Emerald Shiny Crocodile with gold hardware;

9. Hermes Birkin B30 Himalaya Crocodile;

10. Hermes B20 Mini Birkin Farbourg Bag Crocodile; and

11. Louis Vuitton white crocodile leather wallet with tag (Certificate No. FR2509502432-R, Model: N98109);

12. Louis Vuitton black leather wallet and tag (Model: N94450);

13. Louis Vuitton white python skin wallet (Certificate No. FR2509508386-R. Model: N89148);

14. Louis Vuitton orange alligator wallet (Certificate No. FR2209513716-R, Model: N81511);

15. Louis Vuitton gray bi-fold wallet;

16. Louis Vuitton dark green bi-fold wallet;

17. Louis Vuitton light gray bi-fold wallet;

18. Louis Vuitton white large wallet (Certificate No. PF.BRAZZA NM EX.PY.MNG.W, Model: N89150);

19. Louis Vuitton black wallet;

20. Louis Vuitton large white wallet with lock;

21. Louis Vuitton small brown round purse or watch case with belt;

22. Louis Vuitton black and white roller luggage suitcase (broken zipper);

23. Louis Vuitton teal and gray roller luggage suitcase;

24. Louis Vuitton checkered roller luggage suitcase;

25. Louis Vuitton teal leather tote bag containing wallet;

26. Louis Vuitton black and white bag (Speedy 40) with attached wallet;

27. Louis Vuitton black leather tote bag (Certificate No. FR2509507111, Model: N87491);

28. Louis Vuitton black leather tote bag (Certificate No. FR2509504169, Model: N87491;

29. Louis Vuitton black small purse;

30. Louis Vuitton white crocodile handbag (Certificate No. FR2407503111, KEEP.25BA.EX.NI.M.SN, Model: N82083);

31. Louis Vuitton teal (Speedy 50) handbag (Model: M11565);

32. Louis Vuitton dark teal alligator handbag (Certificate FR2409516270, Model: N87350);

33. Christian Louboutin white handbag with red interior;

34. Louis Vuitton pink (Speedy 40) handbag containing matching wallet (Model: M11563);

35. Christian Louboutin black handbag with red interior (Sneakender 1235134 B674 W53);

36. Louis Vuitton brown glitter handbag;

Defendant's Initials _CD_            14

37. Louis Vuitton blue jean handbag;

38. Louis Vuitton checkered handbag containing matching toiletry bag;

39. Louis Vuitton gray and teal containing matching toiletry bag (interior stains);

40. Christian Louboutin black backpack with gold spikes;

41. Louis Vuitton brown leather handbag containing matching wallet;

42. Louis Vuitton black with jewels (Speedy 30) handbag containing matching wallet;

43. Louis Vuitton white alligator skin leather handbag;

44. Louis Vuitton dark teal alligator handbag (Certificate No. FR2409516990, Model: N87365);

45. Louis Vuitton dark blue python skin handbag (CAPUCI.MINI.EX.PY.SAPH, Certificate No. FR2509500596, Model: N87388);

46. Louis Vuitton forest green alligator leather handbag (Certificate No. FR2509503827, Model: N92891);

47. Louis Vuitton true blue alligator leather handbag;

48. Louis Vuitton black (Speedy 30) handbag "Shibuya Paris" containing matching wallet;

49. Louis Vuitton white and black duffle bag;

50. Louis Vuitton black crocodile handbag (CAPUCI.MINI EX.NI.B.SRB, Certificate No. FR2307512035, Model: N86112);

51. Louis Vuitton white crocodile leather handbag (Certificate No. FR2509503243);

Defendant's Initials CD                 15

52. Louis Vuitton pale blue alligator leather handbag (Certificate No. FR2509515284, Model: N89133);

53. Louis Vuitton Mykonos brown PVC bag containing matching PVC wallet;

54. Christian Louboutin black single strap backpack;

55. Christian Louboutin black single strap backpack containing black pouch;

56. Louis Vuitton orange box containing a pink alligator skin bag (Speedy 30), strap, and matching wallet (Certificate No. FR2509512202-R); and

57. Assorted Louis Vuitton and other luxury luggage and purses in the possession of Christopher Delgado or purchased by him for others.

*Other Property*

1. Louis Vuitton Billiard Monogram GM pool table;

2. Jewelry safe with watch winders;

3. Tiffany Taxi Clock;

4. Tiffany silverware;

5. Tiffany china;

6. Crystal and glassware;

7. Louis Vuitton Coffee Trunk in Pharrell Williams' Monogram Heritage canvas with gold-colored Alessi coffeemaker, eight Splendor cups and saucers, and eight Rivet spoons;

8. Louis Vuitton Montgolfière Aéro clock;

9. 2024 Epic E60L Golf Cart, Serial No. 7R4CL4BA3RC700493;

10. Wine and spirit collection; and

Defendant's Initials  CS

16

11.    Sports and Celebrity Memorabilia.

**B.    Foreign Personal Property**

<u>Watches</u>

1.    Audemars Piguet Royal Oak Selfwinding Chronograph watch with smoked blue "Grande Tapisserie" dial and diamond bezel;

2.    Audemars Piguet Royal Oak Frosted Gold Double Balance Wheel Openworked watch;

3.    Audemars Piguet Royal Oak Selfwinding Chronograph pink gold watch fully set with brilliant-cut diamonds;

4.    Audemars Piguet Royal Oak Concept Split-Seconds Chronograph GMT Large Date carbon and gold watch;

5.    Audemars Piguet Royal Oak "Jumbo" Extra-Thin gold watch with a smoked yellow-gold-toned "Petite Tapisserie" dial;

6.    Rolex Daytona watch with rainbow bezel;

7.    Rolex Yacht-Master Oysterflex "Cotton Candy" Baguette Diamond white gold watch;

8.    Rolex Oyster Perpetual Day-Date watch in gold with a chocolate, diamond-set dial, diamond-set bezel, and diamond-set President bracelet;

9.    Rolex Oyster Perpetual Day-Date platinum watch with Arabic dial, trapeze diamond-set bezel, and a President bracelet;

10.    Rolex Oyster Perpetual Day-Date 40mm white gold watch with Mother of Pearl dial, diamond-set bezel, and a President bracelet;

11.    Rolex Yacht-Master 40 mm Everose gold watch with diamond-paved dial and Oysterflex bracelet;

Defendant's Initials _CO_                17

12. Rolex Oyster Perpetual Day-Date 40 mm watch in 18kt yellow gold, with a diamond-paved dial, diamond-set bezel, and a President bracelet;

13. Rolex Oyster Perpetual Day-Date 36 mm watch in platinum, with an ice-blue, diamond-set dial, diamond-set bezel, and a President bracelet;

14. Rolex Oyster Perpetual Day-Date 36 mm platinum watch with silver dial, trapeze diamond-set bezel, and a President bracelet;

15. Rolex Oyster Perpetual Day-Date 40 mm watch in 18 kt yellow gold, fluted bezel, with champagne-color dial, fluted bezel, and a President bracelet;

16. Jacob & Co. Astronomia Solar Bitcoin 44 mm Watch in titanium blacked out with DLC, black alligator leather band;

17. Jacob & Co. Casino Roulette Tourbillon Watch with black alligator leather band;

18. Jean Schlumberger by Tiffany & Co. Bird on a Rock Diamond watch with black leather band;

### *Necklaces*

1. Tiffany & Co. Titan by Pharrell Williams Necklace in Titanium, Gold, and Diamonds;

2. Tiffany & Co. HardWear Graduated Link Necklace in White Gold with Pavé Diamonds;

3. Tiffany & Co. Jean Schlumberger Gold and Diamond Necklace;

4. Tiffany & Co. Titan by Pharrell Williams Necklace in 18k Yellow Gold with Diamonds; and

5. Tiffany & Co. Tiffany 1837 Makers I.D. Tag Pendant in yellow gold with Goliath logo on a yellow gold beaded chain.

Defendant's Initials _CS_                    18

### *Cufflinks*

1. Three pairs of Goliath Logo Cufflinks;

2. One pair of Rolls Royce Cufflinks;

3. One pair of Christian Dior Logo Cufflinks;

4. One pair of Louis Vuitton Cufflinks; and

5. One pair of round Cartier Santos-style Cufflinks.

### *Bracelets*

1. Tiffany & Co. Titan by Pharrell Williams Bracelet in Titanium, Gold, and Diamonds;

2. Tiffany & Co. Titan by Pharrell Williams Bracelet in 18k Yellow Gold with Diamonds;

3. Tiffany & Co. Jean Schlumberger Gold and Diamond Bracelet;

4. Tiffany & Co. Tiffany T1 bangle in white gold with baguette and pavé diamonds;

5. Tiffany & Co. Tiffany T1 wide diamond hinged bangle in white gold with emeralds;

6. Tiffany & Co. Tiffany T1 wide diamond hinged bangle in white gold;

7. Tiffany & Co. Tiffany Lock bangle in white gold with full pavé diamonds;

8. Tiffany & Co. Tiffany T pavé diamond square bracelet in yellow gold;

9. Bvlgari Serpenti Viper Bracelet in 18k white gold set with full pavé diamonds;

10. Bvlgari Serpenti Viper Bracelet in 18k rose gold set with full pavé diamonds;

Defendant's Initials _CD_                    19

11. Van Cleef & Arpels Vintage Alhambra Bracelet, 5 Motifs in 18K yellow gold, diamond, and malachite; and

12. Van Cleef & Arpels Vintage Alhambra Bracelet, 5 Motifs in 18K gold, diamond, mother-of-pearl (dark).

*Earrings*

1. One pair of Louis Vuitton Princess Cut Diamond Stud Star cut Earrings; and

2. One pair of Louis Vuitton Volt One Stud White Gold and Diamond Earrings.

*Other Jewelry*

1. Tiffany & Co. Jean Schlumberger Gold and Gem Set Fish Brooch; and

2. Men's Diamond Encrusted Goliath Logo Ring.

The net proceeds from the forfeiture and sale of any specific assets will be credited to and reduce the amount the United States shall be entitled to forfeit as substitute assets pursuant to 21 U.S.C. § 853(p).

The defendant acknowledges and agrees that (1) the defendant obtained at least $250 million as a result of the commission of the offenses and (2) as a result of the acts and omissions of the defendant, the proceeds not recovered by the United States through the forfeiture of the directly traceable assets listed herein have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result

Defendant's Initials _CD_                20

of the offenses of conviction and, further, the defendant consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offenses and consents to the entry of the forfeiture order into the Treasury Offset Program. The substitute assets to be forfeited in satisfaction of the order of forfeiture include, but are not limited to, any equity in the following real properties not traceable to proceeds:

1.    The real property located at 746 Cavan Drive, Apopka, Florida 32703; and

2.    The real property located at 2142 Country Side Drive, Apopka, Florida 32712.

The defendant additionally agrees that since the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant expressly consents to the forfeiture the above-mentioned substitute assets. The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence and the United States shall not be limited to the forfeiture of the substitute assets, if any, specifically listed in this plea agreement.

The defendant agrees and consents to the forfeiture of these assets

Defendant's Initials _CO_          21

pursuant to any federal criminal, civil, judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be

Defendant's Initials _CD_                    22

interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

Additionally, prior to the Indictment, the United States filed a related civil forfeiture case, *United States v. Assets Identified in Paragraph One of Verified*

Defendant's Initials __C D__                    23

*Complaint*, Case Number: 6:26-cv-1134-CEM-LHP (M.D. Fla.), (the Civil Forfeiture Action), which remains pending. In order to resolve the pending criminal and civil forfeitures, the defendant agrees that by signing this plea agreement, he is consenting to the civil forfeiture and agrees to file a consent to forfeiture in the Civil Forfeiture Action on his behalf and on behalf of Habibi Holdings LLC and Habibi HQ LLC, which are entities that he created and controls.

The defendant, in agreeing to forfeit these assets, consents to the United States filing unopposed motions for judgments of forfeiture for these assets in the Civil Forfeiture Action at any time after this plea agreement is filed with the Court.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

## B.   **Standard Terms and Conditions**

### 1.   Criminal Monetary Penalties

#### a.  Special Assessment

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money

Defendant's Initials _CAD_                    24

order to the Clerk of the Court in the amount of $300, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.

b. Restitution

Restitution is addressed in paragraph 6.

c. Fines

The defendant understands that this agreement imposes no limitation as to fines.

d. Financial Disclosures

The defendant agrees to complete and submit to the United States within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant guarantees that his financial statement and disclosures will be complete, accurate, and truthful, and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee, or other third party. The defendant agrees to provide any supporting documents requested by the United States. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other

Defendant's Initials _CD_                    25

financial information concerning the defendant, to make recommendations to the Court and for collecting any criminal monetary penalties or forfeiture ordered by the Court. The defendant expressly authorizes the United States to obtain current credit reports to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

e. Preservation of Assets

Upon execution of the Plea Agreement, the defendant agrees not to transfer, sell, or dispose of any of defendant's property valued at $5,000 or more, held jointly, individually, or by nominee/third party. If the defendant determines that such transfer, sale, or disposal is appropriate, defense counsel will advise United States not less than 10 days before the proposed sale or transfer. If the defendant does not comply with this agreement, the defendant recognizes that the United States may not move to reduce the offense level by one additional level pursuant to USSG § 3E1.1(b), and may in its discretion argue to the Court that the Defendant should not receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a). However, the defendant may not withdraw his guilty plea because of his failure to comply with this provision.

f. Payment

The defendant agrees that any criminal monetary penalty imposed by the Court will be due immediately upon entry of the judgment and subject to immediate enforcement, in full, by the United States, including as authorized by 18 U.S.C. § 3613. In addition, the defendant agrees that the United States may submit the

Defendant's Initials _C.D._                26

criminal monetary penalties imposed by the Court to the Treasury Offset Program for collection.

The defendant agrees to pay restitution to the fullest extent possible before sentencing. Any payments made before sentencing should be made only after consulting with the United States. After such consultation, any restitution payment shall be made by cashier's check or money order payable to Clerk of Court, United States District Court for the Middle District of Florida and mailed to Clerk of Court, United States District Court for the Middle District of Florida, Debt Collection Unit, 401 West Central Boulevard, Suite 1200, Orlando, Florida 32801.

If the defendant is financially able to pay restitution, partially or in full, before sentencing and fails to do so, then the United States may withdraw any sentencing recommendations otherwise provided for in this Agreement, may oppose the defendant's receipt of acceptance of responsibility, and may request an enhancement for obstruction of justice.

If the Court imposes a payment schedule for criminal monetary penalties, the defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full. Similarly, if the defendant elects to participate in the Bureau of Prisons' Inmate Financial Responsibility Program (IFRP), compliance with an IFRP payment plan does not preclude the United States from pursuing any other means of collection, including offsetting the defendant's inmate trust account.

Defendant's Initials _CD_                    27

2.    Supervised Release

The defendant understands that the offenses to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office

Defendant's Initials _C&D_                    28

within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared

Defendant's Initials _CD_                29

by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.     <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises

Defendant's Initials ⟨C⟩                    30

its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete

Defendant's Initials ____          31

satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    Factual Basis

        Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt. Defendant agrees he purchased the

Defendant's Initials  C D                 32

property identified in the Forfeiture section with fraud proceeds (or in a few instances received the property as a gift because of his role in the Goliath fraud).

12.    Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.  Certification

The defendant and defendant's counsel certify that this plea agreement

has been read in its entirety by (or has been read to) the defendant and that defendant

fully understands its terms.

DATED this _22_ day of June 2026.

GREGORY W. KEHOE
United States Attorney


Christopher Alexander Delgado
Defendant

Hannah Watson
Assistant United States Attorney


Sean P. Shecter, Esq.
Attorney for Defendant

Richard Varadan
Assistant United States Attorney


Maurice Johnson, Esq.
Attorney for Defendant

Michael P. Felicetta
Assistant United States Attorney
Chief, Orlando Division


Defendant's Initials _____

34

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 6:26-cr-

CHRISTOPHER ALEXANDER DELGADO

PERSONALIZATION OF ELEMENTS

Count One:

As to Count One, in the Middle District of Florida and elsewhere,

First:      Did two or more persons, in some way or manner, agree

to try to accomplish a common and unlawful plan to

commit wire fraud, as charged in the information?

Second:     Did you know the unlawful purpose of the plan and

willfully join in it?

As to Count Two, in the Middle District of Florida and elsewhere,

First:      Did you knowingly devised or participate in a scheme to

defraud someone by using false or fraudulent pretenses,

representations, or promises?

Second:     Were the false pretenses, representations, or promises

about a material fact?

Third:      Did you act with the intent to defraud?

Defendant's Initials _CS_                        35

| | |
|---|---|
| <u>Fourth</u>: | Did you transmit or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud? |

As to Count Three, in the Middle District of Florida,

| | |
|---|---|
| <u>First</u>: | Did you knowingly engage or attempt to engage in a monetary transaction? |
| <u>Second</u>: | Did you know that the transaction involved property or funds that were the proceeds of some criminal activity? |
| <u>Third</u>: | Did the property have a value of more than $10,000? |
| <u>Fourth</u>: | Was the property in fact proceeds of wire fraud? |
| <u>Fifth</u>: | Did the transaction take place in the United States? |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 6:26-cr-

CHRISTOPHER ALEXANDER DELGADO

FACTUAL BASIS

Overview

Christopher Alexander Delgado was a resident of Orange County, in the
Middle District of Florida. From at least January 2023 through January 2026,
Delgado was the founder, president, and chief executive officer of Goliath Ventures,
Inc., formerly known as Gen-Z Venture Firm, which was a Florida corporation and
later reincorporated in Wyoming. Delgado held ultimate control over Goliath's
finances and business decisions. During this time, Delgado entered into an
agreement with others known and unknown to the United States to use Goliath as a
Ponzi scheme.[2] Delgado was the organizer and leader of this extensive Ponzi
scheme that involved five or more participants.

---

[2] A "Ponzi scheme" is a form of investment fraud that involves the payment of
purported returns to existing investors from funds contributed by new investors.
Ponzi scheme organizers often solicit new investors by promising to invest funds in
opportunities claimed to generate high returns with little or no risk. Rather than
engaging in any legitimate investment activity, the fraudulent actors focus on
attracting new money to make promised payments to earlier investors as well as to
divert "invested" funds for personal use.

Defendant's Initials _CD_                    37

Delgado and his co-conspirators represented to the public that Goliath was a joint-venture cryptocurrency investment enterprise that invested in blockchain[3] and cryptocurrency projects and that operated decentralized finance liquidity pools[4]. In truth, Goliath was a large-scale fraud scheme through which Delgado and others known and unknown to the United States solicited at least 1,000 victim investors, resulting in an actual loss of at least $250 million.

Delgado and his co-conspirators solicited prospective investors in person and over the internet. Investors were induced to give money to Goliath through personal

---

[3] A "blockchain" is a distributed database maintained across a network of computers. Each transaction is grouped into a "block," which is then cryptographically linked to the previous block, forming a chronological and tamper-resistant chain. Once a transaction is recorded on the blockchain, it cannot be altered or deleted without detection.

[4] A "liquidity pool" is a crowdsourced pool of coins or tokens that are locked in a smart contract and used to facilitate trades between those assets on a decentralized exchange. Liquidity pools enable users to buy and sell cryptocurrency on decentralized exchanges or "DeFi" platforms without the need for centralized exchange. Liquidity pools are typically funded by individuals who deposit pairs of cryptocurrency tokens into the pool. Depositors typically receive a portion of transaction fees or other incentives generated by trading activity within the pool. Trades conducted through liquidity pools are executed automatically by smart contracts. These formulas adjust the price of assets in the pool based on supply and demand. As trade occurs, the balances of the pooled assets change, and the value of a depositor's share of the pool may increase or decrease accordingly. A decentralized exchange is a peer-to-peer marketplace that connects cryptocurrency buyers and sellers. In contrast to centralized exchanges, such as Coinbase, decentralized platforms are non-custodial, meaning a user remains in control of their private keys when transacting on a decentralized exchange. In the absence of a central authority, decentralized exchanges employ smart contracts that self-execute under set conditions and record each transaction to the blockchain. A smart contract is a digital agreement stored and executed on a blockchain network. Smart contracts are programmed to perform specific actions once predefined conditions trigger them.

Defendant's Initials _CD_                    38

referrals, professional marketing materials, luxury events, charitable sponsorships, and some monthly payments of purported returns, all of which were designed to establish Goliath's bona fides with investors.

Delgado and his co-conspirators required investors to sign "Joint Venture Agreements" with Goliath, become "partners," and invest their money. There was typically a minimum investment of $100,000 to gain access to these purported opportunities. The investors were led to believe that after transferring their money into Goliath's bank accounts, their money would be converted into cryptocurrency, transferred to an "encrypted ledger," and placed into cryptocurrency liquidity pools. Delgado and his co-conspirators represented that the liquidity pools would generate guaranteed monthly returns, which investors could either withdraw or leave in the liquidity pools to generate even greater returns.

Many of the investors understood the money they sent to Goliath to be for investment purposes based on Goliath's marketing materials and contracts. Goliath's marketing materials and website advertised Goliath as "a joint venture private fund that invested in blockchain and cryptocurrency projects." Goliath further characterized itself as "a pioneering firm specializing in blockchain development and decentralized finance strategies." It purported to leverage "liquidity pools to facilitate passive income generation, enhance market efficiency, and provide qualified investors with access to innovative financial opportunities."

The representations made by Delgado and his co-conspirators induced the investors to give their money to Goliath. However, unknown to the investors,

Defendant's Initials _CD_                    39

Delgado and his co-conspirators did not invest the funds in cryptocurrency liquidity pools as promised. The majority of the investors' funds sat as cash in Goliath's bank accounts and cryptocurrency wallets. They used the money to pay for luxury travel, events, vehicles, and other goods for their personal enrichment and to lure in additional investors through a projected image of success. They also used the funds to pay distributions to investors that Delgado and his co-conspirators falsely represented had been generated through cryptocurrency liquidity pools. Delgado spent investors' funds on four residential properties that were each worth over $1 million, multiple luxury vehicles, and jewelry. One of the properties Delgado purchased with investors' funds was a home in Windermere, Florida. Delgado bought the home for approximately $8.5 million of investors' funds.

Delgado and his co-conspirators took various steps to hide their fraudulent scheme from the investors and to maintain their trust, including: (1) providing investors with fabricated statements related to their investment that purported to show returns when there were none, (2) providing investors with false explanations for delayed payments and redemptions, and (3) allowing some investors to collect more money from Goliath than they initially invested. These actions afforded Goliath the opportunity to hide their fraudulent scheme from their investors and continue operating the Ponzi scheme.

Beginning in late 2025, investors attempted to withdraw their principal or purported returns. Goliath delayed payments, provided shifting explanations, and

Defendant's Initials ___CD___                    40

ultimately restricted or terminated the investor's access to purported information about their investments.

### Background on cryptocurrency

Cryptocurrency ownership is controlled by cryptographic keys. A public address functions similarly to a bank account number and is used to receive cryptocurrency. A corresponding private key is required to authorize transactions and transfer cryptocurrency from one address to another. Possession of the private key allows the holder to control and move the cryptocurrency. Private keys may be stored in various forms, including software applications, hardware devices, written records, or cloud-based storage. Cryptocurrency may be stored in digital wallets, which can exist as applications on computers or mobile devices, online accounts hosted by cryptocurrency exchanges, or specialized physical devices known as hard wallets.

A cryptocurrency exchange, such as Coinbase, is a type of digital currency exchange where cryptocurrency can be bought, sold, and traded for fiat currency or other digital assets. Fiat currency is any type of government-issued currency, such as the United States dollar, that is used as legal tender by a specific nation, government, or region's citizens. Fiat currency is not backed by a physical commodity, but instead by the government that issued it.

Coinbase is a United States-based cryptocurrency exchange and financial technology company that operates an online platform through which individuals and entities can buy, sell, transfer, store, and manage digital assets, including

Defendant's Initials _CD_                    41

cryptocurrencies such as Bitcoin and USDC. Coinbase provides hosted digital wallets, brokerage services, and trading functionality that allow users to convert fiat currency into cryptocurrency and vice versa. Coinbase accounts are typically associated with verified user identities and may be linked to bank accounts, debit cards, or other payment methods to facilitate deposits and withdrawals. The platform maintains records of account activity, including transactions, transfers, and balances.

Cryptocurrencies, such as Bitcoin and USD Coin ("USDC"), are electronically sourced units of value that exist on the internet. USDC is a United States dollar-pegged cryptocurrency designed to maintain a value of one United States dollar per token. Cryptocurrencies are generated and tracked through computer software in a peer-to-peer network, rather than issued from a government or other entity. Users of cryptocurrencies send units of value to and from "addresses," which are unique strings of numbers and letters that function like a public account number. Cryptocurrency transactions are recorded on a publicly available, distributed ledger, often referred to as a "blockchain."

<u>Delgado and his co-conspirators' false representations</u>

From at least January 2023 through at least January 2026, Delgado and his co-conspirators orchestrated a Ponzi scheme by giving fraudulent information to potential investors to solicit their funds, by providing false promises to investors in contracts regarding how the funds would be invested, and by moving the investors' funds through Goliath's bank accounts and cryptocurrency wallets to pay some

Defendant's Initials _CD_               42

investors purported investment earnings and to pay Delgado's lavish personal expenses.

Delgado and his co-conspirators told investors through presentations and marketing materials that their funds would move from a traditional bank account in Goliath's name to Coinbase, it would then move to an "encrypted ledger," and it would ultimately move into liquidity pools where returns would be generated. The Goliath marketing materials represented to investors that their funds would be deployed into a structured and actively managed DeFi liquidity pool strategy. The materials described sophisticated risk management tools-including stop-loss mechanisms, slippage monitoring, and centralized exchange hedging-and portrayed the strategy as a disciplined, yield-generating liquidity pool program designed to benefit accredited investors. These representations were materially false and misleading because, despite raising hundreds of millions of dollars from investors, the government's evidence shows that Goliath did not invest any of the investors' funds in Uniswap liquidity pools or any of the liquidity pool strategies described in marketing materials. These actions directly contradicted the core representations that investor capital would be allocated to and managed within such DeFi liquidity pools. The following is a representation of Goliath's purported investment cycle as presented to investors through marketing materials:

Defendant's Initials _CD_                43



Delgado and his co-conspirators entered "Joint Venture Agreements" with Goliath investors. Delgado often signed these agreements on behalf of Goliath. In the agreements, Delgado and his co-conspirators represented that they were partnering with the investor and entering a joint venture that would utilize the investors' funds to make deposits into liquidity pools. The agreements outlined terms and conditions of the investments, including details about how Goliath would invest in liquidity pools and the distribution of the return on the investors' investment. The agreement assured the investors that the liquidity pools would run on one or more exchanges. The agreements sometimes guaranteed monthly returns ranging from three to eight percent, or they guaranteed the return of an investor's principal. Investors were offered the option to withdraw their monthly return or to roll over

Defendant's Initials ___CD___            44

monthly returns and their profits would be reinvested to increase their account balances. The agreement told investors that they could remove their money at any time. Delgado and his co-conspirators represented to investors that Goliath would generate its revenue by charging fees to investors.

Delgado and his co-conspirators provided investors with access to an online account portal with a mobile application that purported to display real-time account activity, including invested principal and returns earned. While the amounts of principal invested were accurately reflected, the reported returns were materially false and misleading. In reality, little to no investor funds were deployed into the investment strategy described, and the "returns" displayed in the portal were not generated from actual trading or liquidity pool activity. Instead, the returns were artificially calculated and manipulated to match the rate of return offered to each investor, creating the false appearance of legitimate investment performance.

The information provided in Delgado and his co-conspirators' investment materials, contracts, and online portal was false and fraudulent. The investors' funds were not used for the promised investment activity. The investors' funds were primarily maintained as cash in Goliath's bank accounts and cryptocurrency wallets.

<u>Goliath's financial review</u>

Delgado directed investor funds into numerous bank accounts under Goliath's name and held across different financial institutions. Delgado opened at least 30 bank accounts, often with co-signers, in the names of corporations that Delgado created for the purpose of receiving and moving Goliath investors' funds. Investors'

Defendant's Initials ___CD___          45

funds deposited into one account were often transferred to other accounts controlled by Delgado.

The financial activity of the accounts revealed a network of bank accounts that either received funds directly from investors or obtained funds through transfers originating from initial investor-funded accounts.

One of Goliath's business bank accounts was a Financial Institution #1 account ending in 1353. Delgado is one of two signers on the bank account. He is listed as the owner. Millions of dollars in investors' funds were moved through this account. Delgado used investors' funds in this account to fund personal expenses, including the purchase of real property in Windermere, Florida on September 5, 2025. The Windermere, Florida property is titled in his name.

Goliath had a business bank account at Financial Institution #3. The Goliath bank account at Financial Institution #3 ended in 9136. Delgado was a co-signer on this account. Delgado used investors' funds from this account for personal expenditures, including a wire transfer of $500,000 on July 30, 2025, towards the Windermere, Florida property that is titled in his name.

Goliath had a business bank account at Financial Institution #4. The Goliath bank account at Financial Institution #4 ended in 0305. Delgado was the sole signatory on this account. Delgado used investors' funds from this account for personal expenditures, including a wire transfer of $358,890.46 on August 5, 2024, towards the purchase of real property in Sanford, Florida. The Sanford, Florida property is titled in Delgado's name.

Defendant's Initials __CD__                    46

Goliath had Coinbase wallets, as well. Delgado was the sole signatory on Goliath's Coinbase wallets.

After investors would deposit funds into Goliath accounts, the money was moved between accounts. The following examples show how money was moved:

1. Investors primarily deposited funds into the Goliath bank account at Financial Institution #3 ending in 9136, the Goliath bank account at Financial Institution #4 ending in 0305, or a Goliath Coinbase wallet. For example, from January 2023 through June 2025, approximately $253 million was deposited into the Financial Institution #4 account ending in 0305. From May 2025 through September 2025, approximately $75 million was deposited into the Financial Institution #3 account ending in 9136. From January 2023 through January 2026, approximately $62 million was received by Goliath's Coinbase wallets.

2. From January 2023 to September 2025, approximately $165 million was sent to Goliath's Coinbase wallets from the Goliath bank accounts at Financial Institution #4 ending in 0305 and at Financial Institution #3 ending in 9136. From January 2023 through June 2025, approximately $123 million from the Goliath Financial Institution #4 account ending in 0305 to Goliath's Coinbase. From May 2025 through September 2025, approximately $42 million from the Goliath Financial Institution #3 account ending in 9136 to Goliath's Coinbase wallets.

Goliath invested little, if any, of the investors' funds in cryptocurrency

Defendant's Initials  CD                    47

investments. Only a nominal amount of investor funds were transferred to liquidity pools. Investor funds were either held in traditional bank accounts or, if they converted to cryptocurrency, were held as USDC, a cryptocurrency "stablecoin" which is pegged to the United States dollar. Investor funds were moved between traditional accounts or converted to USDC, but they were not deposited into liquidity pools as promised.

The funds from Goliath's cryptocurrency wallets were transferred to wallets held by Delgado and his co-conspirators and to wallets held by investors. Delgado and his co-conspirators falsely represented to investors that Goliath was giving them investment returns when, in reality, Delgado and his co-conspirators were giving investors other investors' funds. The following examples show how money was moved:

1. From January 2023 through June 2025, approximately $50 million from the Goliath Financial Institution #4 account ending in 0305 was sent to investors purportedly as returns on investments. Although Goliath falsely represented that these payments were returns on investments, they primarily were funded with other investors' funds from the Goliath Financial Institution #4 account ending in 0305. The money was not from returns on any investment activity.

2. From May 2025 through September 2025, approximately $11 million from the Goliath Financial Institution #3 account ending in 9136 was sent to investors purportedly as returns on investments. These funds primarily

Defendant's Initials  C̲D̲          48

originated from investors' funds held in the Goliath Financial Institution #3 ending in 9136. The money was not from returns on any investment activity.

Funds from investors were also used to pay for Goliath's corporate spending, including payments for corporate credit cards, extravagant business gatherings, Christmas parties, and luxury travel accommodations. Investors' balances and returns reflected in the Goliath accounts, as provided to investors through Goliath's online portal, were fictitious and not tied to actual investment of their money in a liquidity pool. Instead, balances were artificially manipulated to reflect promised returns, creating a false appearance of consistent profitability. For example, account overviews for Goliath investors reflected "Monthly Distribution Rates" and "Monthly Distribution Balances" that purported to reflect returns on investment. In reality, there were no such returns.

### Victim Investor #1

Victim Investor #1 was a Polk County resident in the Middle District of Florida who gave money to Delgado based on the false representations made by Delgado and his co-conspirators regarding how his money would be invested.

One of Delgado's co-conspirators solicited Victim Investor #1 in person to invest in Goliath, and they were convinced to invest based on Goliath's marketed returns. On July 18, 2025, Delgado and Victim Investor #1 signed a Joint Venture Agreement. Through four wire transfers, Victim Investor #1 electronically transferred a total of $2 million to Goliath.

Defendant's Initials _CD_                49

On July 21, 2025, Victim Investor #1 electronically wired $500,000 from their Financial Institution #2 account ending in 5484 to Goliath's Financial Institution #3 bank account ending in 9136. This electronic financial wire originated from a Financial Institution #2 branch in Osceola County, in the Middle District of Florida. The physical and electronic processing hub for Financial Institution #2's domestic wire transfers is centrally headquartered in Charlotte, North Carolina. Financial Institution #3 is headquartered in Minneapolis, Minnesota. Thus, Victim Investor #1's wire transfer affected interstate commerce.

On September 3, 2025, Victim Investor #1 electronically wired $500,000 from their Financial Institution #2 bank account ending in 3883 to Goliath's Financial Institution #1 bank account ending in 1353. This wire transfer affected interstate commerce, as discussed above.

On September 30, 2025, Victim Investor #1 electronically wired $500,000 from their Financial Institution #2 bank account ending in 3883 to Goliath's Financial Institution #1 bank account ending in 1353. This wire transfer affected interstate commerce, as discussed above.

On October 30, 2025, Victim Investor #1 went to a monthly social at the home of one of Delgado's co-conspirators. Delgado arrived at the event in a Rolls Royce Ghost. Victim Investor #1 spoke with Delgado and asked him how long he thought the investment program would continue. Victim Investor #1 told Delgado that they cannot lose the money they invested, and they asked Delgado to tell them if he had any concerns. Delgado told Victim Investor #1 that he thought the

Defendant's Initials __CD__                    50

investment program would continue another five to seven years and that a large part of the program depends on the government regulations that typically get enacted.

On October 31, 2025, Victim Investor #1 electronically wired $500,000 from their Financial Institution #2 bank account ending in 3883 to Goliath's Financial Institution #1 bank account ending in 1353. This wire transfer affected interstate commerce, as discussed above.

After Victim Investor #1 gave Goliath $2 million to invest in cryptocurrency liquidity pools, Victim Investor #1 received approximately $60,000 from one of Delgado's co-conspirators.

Victim Investor #1's money was not invested as promised. Instead, Victim Investor #1's money was kept in Goliath's Financial Institution #1 bank account ending in 1353 with other investors' funds. Delgado used the investors' funds in this bank account to purchase a home in Windermere, Florida for approximately $8.5 million after Victim Investor #1 had electronically transferred $500,000 into the account.

<u>Delgado's purchases</u>

Delgado used investors' funds from the Goliath bank accounts to purchase the property identified in the Forfeiture section with fraud proceeds (or in a few instances received the property as a gift because of his role in the Goliath fraud).

Between August 2024 and September 2025, Delgado spent almost $17 million to buy five homes and an office space. Between January 2023 and April 2025, Delgado spent more than $2.5 million to purchase, lease, or pay off loans on eleven

Defendant's Initials _CD_                51

vehicles. Delgado also used fraud proceeds to make mortgage payments on a home he had purchased in 2021. The chart below lists the Defendant Assets as well as their purchase price and acquisition date:

| Acquisition Date | Defendant Asset | Purchase Price |
|---|---|---|
| September 5, 2025 | 5271 Isleworth Country Club Drive, Windermere, Florida | $8.5 million |
| July 31, 2025 | 141 S. Phelps Avenue, Winter Park, Florida | $3.2 million |
| May 29, 2025 | 189 S. Orange Avenue, Unit 1800S, 1810S, 1820S & 1870S, Orlando, Florida | $3.2 million |
| April 22, 2025 | 2025 Lamborghini Revuelto | $719,517.01 |
| April 21, 2025 | 2024 Rolls Royce Ghost | $379,995 |
| April 9, 2025 | 2024 Bentley Bentayga | $285,540 |
| March 30, 2025 | 2024 Lamborghini Huracán EVO Spyder | $473,723 |
| March 19, 2025 | 2025 Cadillac Escalade V | $238,561.25 |
| March 4, 2025 | 2024 Lincoln Navigator L | $125,862.37 |
| February 13, 2025 | 17416 Bal Harbour Drive, Winter Park, Florida | $740,000 |
| December 5, 2024 | 222 Pawnee Trail, Kissimmee, Florida | $862,500 |
| August 5, 2024 | 7333 Bella Foresta Place, Sanford, Florida | $1.65 million |
| April 12, 2024 | 1951 Mercury | $52,000 |

Defendant's Initials _CD_                    52

| January 12, 2024 | 2017 Mercedes Benz C300 | $15,000 |
|---|---|---|
| October 27, 2023 | 2023 Rolls Royce Cullinan | $472,350 |
| September 5, 2023 | 2022 Mercedes Benz Sprinter | $235,804.96 |
| October 23, 2022 | 2022 GMC Sierra HD | $93,963 |
| December 20, 2021 | 746 Cavan Drive, Apopka, Florida | $725,000 |

On September 5, 2025, Delgado used funds from investors, including Victim Investor #1, to purchase the property at 5271 Isleworth Country Club Drive, Windermere, Florida 34786 for approximately $8.5 million. The entire purchase of the Windermere, Florida property was paid with funds Delgado obtained from investors who believed they were investing in liquidity pools.

This property is a 11,403 square foot home that is on 1.17 acres on the Isleworth Country Club golf course. It has seven bedrooms and thirteen bathrooms.

Defendant's Initials _CD_                    53





Defendant's Initials _CD_    54

*Windermere, Florida home*

On July 30, 2025, Delgado directed an electronic transfer of $500,000 from Goliath's bank account at Financial Institution #3 ending in 9136, which was funded with investors' funds, to an Orlando law firm. Delgado had retained the law firm to represent him in purchasing real property in Windermere, Florida.

On September 4, 2025, Delgado directed an electronic transfer of $5,628,569.57 from Goliath's bank account at Financial Institution #1 ending in 1353 to the law firm for the purchase of the Windermere, Florida property. This transfer of funds was one day after Victim Investor #1 electronically wired $500,000 into Goliath's bank account at Financial Institution #1 ending in 1353 under the fraudulent pretense that his funds would be invested in cryptocurrency liquidity pools. Victim Investor #1 would not have given Delgado or his co-conspirators $500,000 on September 3, 2026, if he had known that his money would be used by Delgado the following day to buy a multi-million-dollar home.

To complete the purchase, Delgado directed a final electronic transfer of $2,320,010.49 from Financial Institution #1 account ending in 1353 to the law firm.

Delgado knew the funds used to purchase this property were derived from investors who electronically transferred their money into Goliath's bank account under the false representations that their money would be invested in cryptocurrency liquidity pools because Delgado and his co-conspirators made these false representations to induce the investors to invest their money and Delgado was a signatory on all the accounts he used to purchase this property.

Defendant's Initials _CSD_                    55

The above is merely a summary of some of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all the events, persons involved, or other information relating to this case.

Defendant's Initials _CD_                    56